**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— ) | |
| ) | |
| **LAVONNE JINKS-UMSTEAD,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 99-2691 (GK/JMF)** |
| ) | |
| **GORDON ENGLAND,** ) | |
| **SECRETARY OF THE NAVY,** ) | |
| **Defendant.** ) | |
| ) | |
| ———————————————— ) | |

**MEMORANDUM OPINION**

This case is before me to resolve all discovery disputes.  Ripe and ready for resolution are four discovery motions.  For the reasons given herein, <u>Plaintiff's Motion to Require the Navy to Comply with the Court's Order of June 30, 2004 Requiring the Navy to Supplement Its Answers to Plaintiff's Interrogatory #4 and Memorandum in Support Thereof</u> ("Pl.'s Mot. to Supp.") is denied; <u>Plaintiff's Motion to Conduct Additional Depositions, to Extend the Time for Completing Discovery, and to Require the Navy to Pay Reasonable Attorney's Fees and Costs Incurred as a Result of the Navy's Destruction of Documents and Obstruction of Plaintiff's Discovery and Memorandum in Support Thereof</u> ("Pl.'s Mot. for Addl. Disc.") is denied; <u>Plaintiff's Motion for Protective Order</u> ("Pl.'s Mot. P.O.") is denied; and <u>Plaintiff's Motion to Compel the Navy to Supplement Its Initial Disclosures and Responses to Plaintiff's Request for Production of Documents ## 1, 2, 39, 55, 56, 76, and 77</u> ("Pl.'s Mot. Compel") is granted in part and denied in part.

I.       **BACKGROUND**

In 1991, Lavonne Jinks-Umstead ("Jinks-Umstead" or "plaintiff") began working for the Department of the Navy ("Navy" or "defendant").   In February 1997, she was assigned to work at Carderock as a Head Contracting Officer.   At some point after her assignment to Carderock, the Navy decided to reduce the number of staff at that office.   Defendant also removed plaintiff's supervisory status.   Plaintiff claims that these restructuring decisions were discriminatory and retaliatory, in violation of Title VII of the Civil Rights Act.   Defendant, however, maintains that the decisions were based on legitimate business reasons.

During discovery before the first trial, plaintiff requested work in place ("WIP") reports from defendant.   Plaintiff believes that the WIP reports are critical to her case because they show whether defendant was justified in restructuring her office and taking away her support staff.   Defendant, however, did not turn over any WIP reports before trial, claiming that it no longer had them.   Indeed, one of plaintiff's supervisors, Patricia Holleran ("Holleran"), signed a declaration ("Holleran Declaration") that stated: "EFACHES does not retain or have a depository for historical work in place ('WIP') reports." Holleran Dec. at 1-2.

In the middle of the first trial, after plaintiff had rested her case-in-chief, defendant produced approximately 1,400 pages of WIP reports for the first time.   Thereafter, Judge Kessler granted a new trial to allow plaintiff to present her case with the benefit of evidence she was entitled to receive before her first trial.[1]   Judge Kessler also granted plaintiff's motion to conduct additional, limited discovery.

---

[1] Judge Kessler also granted the new trial because several e-mails had been admitted erroneously, but that determination does not bear on the issues presented here.  See Memorandum Opinion, Feb. 6, 2004, at 4.

On June 30, 2004, I resolved several discovery disputes that arose during post-trial

discovery.  I also clarified the scope of the limited discovery that would be allowed, stating that

plaintiff was entitled to seek: "1) information that was not produced, but should have been

produced, to plaintiff during discovery prior to the first trial, and 2) information bearing on why

such information could not be located or was not produced." Memorandum Opinion, June 30,

2004, at 4.  Since I issued that Opinion, several additional discovery disputes have arisen.  This

Opinion and the accompanying Order resolve these issues.

## II.      POST-TRIAL DEPOSITION DISCOVERY

### A.      The Holleran Deposition

After the first trial, plaintiff deposed Holleran, plaintiff's supervisor who signed the

Holleran Declaration stating that EFACHES did not retain historical work in progress reports.

In her post-trial deposition, Holleran testified that she based her staffing

recommendations on: (1) the workload for facility support contracts, which she ascertained by

requesting data from the Facilities Information System ("FIS") database on the number of

contract actions at each facility and the dollar value of the work in place for those contracts; and

(2) conversations with senior contract specialists (known as 1102s), who could inform her as to

whether the workload numbers in FIS were accurate.[2] Id. at 57, 65, 67, 91-93, 96-98, 149, 289.  If

the senior 1102s indicated that there were contract actions that had not been reported in FIS,

Holleran would record the dollar value of those actions so that she could convert it to a staffing

number and incorporate that information into her staffing recommendations. Id. at 99-100.

---

[2] Holleran also testified that she based her staffing recommendations on a loose algorithm
– one staff position for every $2 million worth of contracts.  Holleran Dep. at 22-23, 81, 196.

When Holleran needed information regarding the number of contract actions at each field office and the dollar value of those contracts, she contacted Diane Carney ("Carney") and asked her to "pull . . . a report" from the FIS database. Id. at 28.  Once Holleran received the information, she disposed of the reports as she used them or at the end of the year because "[t]he only thing that was important was the staffing number, which was then transferred to an approval or nonapproval for hiring a replacement for that position." Id. at 30-31. See also id. at 80.  In other words, once she made her final recommendations, she "pitched" the documents she had used. Id. at 103, 176.

Holleran also clarified that there was no "formal report" and that, most of the time, she received the information from the FIS database on yellow "stickies." Id. at 32, 117-18.  Holleran further testified: "[T]here was no document. [Rather, the numbers that supported her conclusions were the] numbers out of FIS and through the discussions with the senior 1102s." Id. at 63-64. She also testified that, when she recorded workload information gleaned from conversations with the supervisory 1102s, she recorded the information on little stickies, which "didn't last very long." Id. at 79-80.

Thus, Holleran discarded the documents, reports, and stickies on which she relied.  The court understands that the data recorded on these papers was the same data that appeared in WIP reports.  Accordingly, Holleran's deposition testimony confirms that Holleran herself did not retain WIP reports, even though at least one other Navy employee possessed them (in hard copy) and the Navy did maintain the underlying data on the FIS system.  In addition, Holleran's deposition testimony confirms that her ultimate staffing recommendations were recorded and incorporated into other documents, such as budget and planning documents given to Bob Silver,

4

Dave Ward, and Norma Jean Schnakenberg. Holleran Dep. at 100, 110, 139, 142-43, 155, 168-71, 193, 198, 200, 205.

### B.    The Carney Deposition

Plaintiff also deposed Carney, the Navy employee who helped develop the FIS system from 1984 until 1994 and led or assisted many of the training sessions when FIS was first widely introduced to Navy employees. Carney Dep. at 37, 87.  She explained that FIS contains two sources of information: (1) pre-written "canned reports," and (2) customized data queries. Id. at 91-92.

As indicated above, Holleran contacted Carney when she needed information on which to base her staffing recommendations.  When asked for figures relating to contract actions and work in place,[3] Carney would pull the numbers from FIS and provide them to the employees from the Contracting Division who requested the information. Id. at 126-28.  Pulling a whole report to provide a number was simply unnecessary. Id. at 165.

Carney explained that it is commonly known that the FIS stores information that can be retrieved via a data query.  Carney further testified that "anything that was converted [from the old database] in December of 1994 is still in the [FIS] database." Id. at 101.  She further testified that all of the data that has been input into the FIS system is still in the database today and can be retrieved via properly formulated queries. Id. at 102.

---

[3] A contract action is the award, modification, or termination of a contract whereas work in place is the amount of work–measured in dollar value–that has been done on a project. Carney Dep. at 127.  According to Holleran, work in place is the "brick and mortar in the ground." Holleran Dep. at 189.  But, the term gets used synonymously with requests for workload relative to facilities in place ("FIP"), or payments made to date on a facility support contract or services contract. Id. at 189.

Carney also explained the difference between WIP reports and data stored on FIS. According to Carney, "[t]he WIP is different because the WIP is an accrued cost field. And again, maybe that's why these reports are hard to get. For example, you cannot get a summary WIP report in looking at the database. You can go contract by contract and say how much work has been done on this contract. . . . The database is strictly containing data. Summary reports are either written through programmers or by using the data query method. That data query method uses WIP flat files to report WIP, which is why I never used them. I used the standard generated reports that came out of California every month." Id. at 144.

These standard monthly reports, called R26s, were sent from California and printed out in hard copy by an office in Washington, D.C. Id. at 108-13. The R26 is one of many reports that can be generated using the FIS database. Id. at 114. Other monthly reports include WIP audit reports and projected WIP reports. Id. at 116. Carney also stated that the only R26s she can currently retrieve are from 2002 because those are the only ones online. Id. at 111. As for reports from earlier years, it appears from Carney's deposition that she produced these reports after she was contacted in the middle of the first trial and that those reports constituted the 1400 pages of "WIP reports" plaintiff received after she had already rested her case. See id. at 125.

## III.    POST-TRIAL DISCOVERY ISSUES TO BE RESOLVED

### A.    Access to the FIS Database

On June 30, 2004, I ordered defendant, by July 8, 2004, to "provide access to the Facilities Information System ("FIS") database for review by plaintiff's counsel or a computer technology consultant hired by plaintiff for the limited purpose of determining whether more information bearing on the workload and staffing at Carderock during the relevant period of

plaintiff's employment (January 1, 1997 through October 1, 1999) can be retrieved from the FIS database." Order, June 30, 2004, at 3-4.  On July 1, 2004, defendant faxed a letter to plaintiff offering to make the FIS database available on July 6 or July 7, 2004.  Plaintiff did not respond to the letter until July 8, 2004.  Plaintiff's lead counsel explains that he was on vacation from July 1 through July 11, 2004, but defendant insists that other counsel for plaintiff confirmed that lead counsel had read the fax on July 1 and that he was in the office as late as July 2, 2004.  Defendant further notes that plaintiff's counsel failed to notify defendant or the court of his unavailability and failed to articulate why other counsel of record could not have reviewed the database on the days indicated by defendant.

As indicated above, on July 12, 2004, plaintiff deposed Carney, the FIS expert at EFACHES headquarters.  Carney testified that it is possible to retrieve more information bearing on the workload and staffing at Carderock during the relevant period of plaintiff's employment with the Navy.

Thus, the court will not analyze counsel's arguments regarding whether plaintiff forfeited the opportunity to inspect the FIS database to determine whether relevant information can be retrieved because Carney's deposition testimony clearly indicates that additional information can be retrieved from the system if specific data queries are formulated.  The important issue, at this point, is ensuring that plaintiff receives relevant information from the FIS database.  To this end, Carney must re-create the process by which she responded to Holleran's requests for what the workload was at the EFACHES field offices (including work in place, number of contract actions, and dollar value of those actions) during the relevant period of plaintiff's employment with the Navy, i.e., January 1, 1997 through October 1, 1999.  This process will require Carney

to formulate queries and recover information from the FIS database, and it may also entail

Carney's consultation with the relevant R26 reports.  Because there is no record of how many

times Holleran requested such information, except for the fact that it was done, at the very least,

when a vacancy needed to be filled and at the end of each year, Carney must provide the

information for every quarter, beginning in January 1997 and ending in December 1999.  It is the

court's intention that Carney do now whatever she did when Holleran asked her for the

information that both she and Holleran described in their depositions.  Defendant must produce

this information to plaintiff within 60 days of the accompanying Order.

### B.      Navy's Compliance with Paragraph 6 of the Court's June 30, 2004 Order

On June 30, 2004, I also ordered defendant to "provide plaintiff with the summaries used

by the Contracting Division and produced from data extracted from the WIP reports for

construction contracts and data from other sources for non-construction contracts that were

generated during the pertinent part of plaintiff's employment with the Navy, *i.e.*, January 1, 1997

through October 1, 1999." Order, June 30, 2004, at 4.

The Navy responded: "No responsive documents exist.  As Patricia Holleran testified in

her deposition on June 28, 2004, these 'summaries' consisted of working notes that she prepared

from FIS data she requested and received from Diane Carney and from other data information

she requested and received from the senior contract specialists at the pertinent field offices for

her personal use in making staffing recommendations.  Ms. Holleran further testified that she

routinely discarded these notes contemporaneously with making those recommendations as she

no longer had need of them." Plaintiff's Response to Defendant's July 15 Report to the Court

("Pl.'s Resp.") at 3-4 (citing defendant's discovery response).

Plaintiff argues that Carney's deposition testimony indicates that electronic copies of "working notes" are contained in the FIS database.  Defendant argues that plaintiff mischaracterizes the deposition testimony of both Holleran and Carney and insists that there are no additional responsive documents to produce.

It is the court's understanding that, while defendant has produced all existing hard copies of reports that were generated from the FIS database, that database still contains information relevant to the workload and staffing at the Carderock field office during the period of plaintiff's employment.  As discussed above, the court also understands that this information can be retrieved if data queries are formulated and entered into the system, but that such queries will not produce any of Holleran's "working notes," which she may have made based on FIS data or conversations with senior 1102s.  Accordingly, as stated above, Carney must formulate queries and recover FIS data relevant to the workload at the EFACHES field offices from January 1, 1997 through October 1, 1999, and defendant must produce this information to plaintiff.

**C.     Navy's Supplemental Response to Interrogatory #4**

Plaintiff's Interrogatory #4 requests that the defendant "[i]dentify each and every document requested in Plaintiff's First Request for Production of Documents, or any subsequent Request for Production of Documents, which has been destroyed, or has not been produced pursuant to the Rules of this court."  In my previous Opinion, I summarized the parties' arguments regarding Interrogatory #4 as follows:

> Plaintiff argues that she is entitled to a supplemental answer to
> Interrogatory #4 because defendant's initial response was "false."
> Defendant insists that its response to Interrogatory #4 "remains []
> substantially accurate" and that it has supplemented its initial
> answer through 1) "[t]he 'WIP Reports' that were produced during

trial"; 2) "the testimony of [Diane] Carney and [Patricia] Holleran at the trial," and 3) "the depositions taken and to be taken in limited discovery."

Memorandum Opinion, June 30, 2004, at 6.  I then stated:

> [U]nder the court's order granting limited discovery, plaintiff is entitled to complete and accurate answers it should have received originally as well as information regarding why such answers were not provided in the first instance.  Interrogatory #4 seeks information that falls within both of these categories.  While the Navy has filed an *opposition* that purports to explain why the documents were not produced before the first trial, plaintiff is entitled to a sworn, complete answer to her interrogatory.  For these reasons, defendant will be required to supplement its responses to Interrogatory #4.

Id. at 6-7.

Since the issuance of that Opinion, the Navy supplemented its response,[4] but plaintiff claims that the Navy's s supplemental answer is "legally insufficient and factually misleading." She also argues that the Navy's response is so "incomplete and evasive" that it constitutes an intentional discovery violation. Pl.'s Mot. to Supp. at 2.  Plaintiff's chief complaints include: (1) the Navy failed to conduct any additional investigation regarding document destruction before submitting its supplemental response; (2) the Navy improperly hides behind a document retention policy; (3) the Navy's duty to preserve relevant records arose on April 13, 1998 (when plaintiff met with an EEO Counselor) or, at the latest, April 28, 1999 (when Holleran and

---

[4]  The supplemental response states, in part:
> Except to the extent Ms. Carney's or Ms. Holleran's work papers are deemed to be agency records, Defendant is not aware of any responsive agency records that have been destroyed other than in the normal course of business and in accordance with Defendant's records retention policies, and prior to the existence of any other legal obligation to retain them, or without knowledge thereof.

Pl.'s Mot. to Supp. at 2. (quoting the Navy's supplemental response).

Schnakenberg prepared a document representing to the Navy's EEO office that the staffing levels

for the EFACHES field offices were based on the number of contracting actions and the value of

the work in place for contracts), not April 27, 2000 (when plaintiff served her discovery

requests); (4) the Navy never identified any documents relied upon by Holleran to staff the

Carderock office of EFACHES from 1997 until 1999; and (5) defendant has failed to address its

failure to produce documents relating to reorganizations during the relevant time period.

 Defendant argues that it has fully complied with the court's Order by providing plaintiff

with "a sworn, complete answer to her interrogatory." <u>Defendant's Opposition to Plaintiff's</u>

<u>Motion to Require the Navy to Comply with the Court's Order of June 30, 2004 Requiring the</u>

<u>Navy to Supplement Its Answers to Plaintiff's Interrogatory #4</u> ("Def.'s Opp. to Pl.'s Mot. to

Supp.") at 2. Defendant further explains that it cited its record retention policy because it is

relevant to issues regarding the retention and destruction of documents. In addition, 29 C.F.R. §

1602.31 refers to a "charge of discrimination," which is a formal EEOC complaint, not informal

counseling. Defendant explains that, because plaintiff did not file a formal charge in the

administrative process and instead filed a civil action in this court, the date of that filing was

cited as a benchmark. Additionally, the records at issue are not "personnel records," which are

the type of records referenced in 29 C.F.R. § 1602.31.

 Under 29 C.F.R. § 1602.31, the government was required to maintain, for a certain period

of time, all personnel or employment records, including "requests for reasonable accommodation,

application forms submitted by applicants and other records having to do with hiring, promotion,

demotion, transfer, layoff, or termination, rates of pay or other terms of compensation, and

selection for training or apprenticeship." 29 C.F.R. § 1602.31. Because the "records" that were

"destroyed" in this case were numbers concerning the workload at various field offices, not personnel records regarding the terms of plaintiff's employment, plaintiff's citation to this regulation is curious.  In addition, even if the "records" fall within this regulation, the data underlying them still exists in the FIS database and has therefore been maintained (even though it has not yet been produced).

In addition, despite plaintiff's protestations to the contrary, the record in this case simply does not support the allegation that defendant is engaging in protracted, calculated attempts to deprive plaintiff of relevant documents.  Indeed, the cases plaintiff cites in support of her motion are quite distinguishable from the case at bar because the district courts had found that either: (1) the sanctioned party engaged in clear and willful discovery violations, or (2) a party's document retention policy was so haphazard that it inexcusably denied its opponent potential evidence, severely prejudicing the other party because the destroyed records had been permanently lost. See, e.g., Webb v. District of Columbia, 146 F.3d 964, 969-71 (D.C. Cir. 1998) (after reviewing the district court's decision to enter default judgment because it had found that the District of Columbia had knowingly engaged in a clear and willful violation of the regulation requiring the government to maintain and preserve personnel records, the court of appeals vacated the judgment and remanded to the district court for consideration of less onerous sanctions); In re Prudential Ins. Co. of America Sales Practices Litig., 169 F.R.D. 598 (D.N.J. 1997) (finding that, even though Prudential had not "intended to thwart discovery through the purposeful destruction of documents, its haphazard and uncoordinated approach to document retention indisputably denie[d] its party opponents potential evidence to establish facts in dispute" and that, because the destroyed records were "permanently lost," the court inferred that the missing documents would

12

lead to the proof of a claim) (citation omitted); <u>William T. Thompson Co. v. Gen. Nutrition Corp.</u>, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984) (finding that the defendant was subject to sanctions because it had knowingly and purposefully permitted its employees to destroy key documents and records).

Here, the situation is far less egregious.  In fact, it appears that a major part of the problem has been a misunderstanding of the difference between "WIP reports" and the FIS database.  Although such a misunderstanding by no means excuses the Navy's failure to produce the reports that were in existence prior to the first trial, the Navy has already been sanctioned, by the award of a new trial, for its failure to produce the documents originally.  Since the new trial was ordered, the Navy has produced five witnesses for deposition and has supplemented its discovery responses.  On the record currently before the court, I see no reasonable grounds upon which this court could find that the Navy has "knowingly and intentionally refused to comply with the Court's June 30, 2004 Order requiring defendant to supplement its answer to Interrogatory #4." <u>See</u> Pl.'s Mot. to Supp. at 7.  Indeed, the Navy has provided a sworn, complete answer to the interrogatory, and defendant need not supplement its response any further.

**D.     Plaintiff's Request for Additional Depositions and Extension of Discovery**

During post-trial discovery, plaintiff took the depositions of the following persons: (1) Carney, (2) Holleran, (3) Patricia Chalfant ("Chalfant"), (4) Cindy Guill ("Guill"), and (5) Chad Miller ("Miller").  Plaintiff now seeks leave to take additional depositions,[5] arguing that, "[i]n view of the Navy's stonewalling and the failure of its witnesses to provide truthful

---

[5] Plaintiff wants to conduct, at the Navy's expense, a 30(b)(6) deposition as well as the depositions of Norma Jean Schnakenberg, Bob Silver, Dave Ward, CPT Julian Sabbatini, and CPT Paul McMahon.

testimony," further deposition discovery is necessary. Pl.'s Mot. for Addl. Disc. at 14.  Plaintiff

also states: "Holleran testified for the first time that her analysis relied on factors other than

dollar value of contracts and the number of contract actions in making staffing decisions for

EFACHES.  This testimony flatly contradicts her earlier sworn testimony and the testimony of

her supervisor, Norma Jean Schnakenberg. Holleran's stunning claim heralds one conclusion,

that the Navy refuses to give straight answer[s] and provides another reason to allow Mrs. Jinks-

Umstead to conduct additional discovery at the Navy's expense." Reply Memorandum in

Support of Plaintiff's Motion to Conduct Additional Depositions, to Extend the Time for

Completing Discovery, and to Require the Navy to Pay Reasonable Attorney's Fees and Costs

Incurred as a Result of the Navy's Destruction of Documents and Obstruction of Plaintiff's

Discovery and Memorandum in Support Thereof ("Reply to Pl.'s Mot. for Addl. Disc.") at 2-3.

Defendant responded by stating that plaintiff's argument "consists only of her request for

relief, and hyperbole–'massive discovery failure,' 'widespread destruction,' 'refusal to produce,'

'selective memory,' 'sharp conflict,' . . . .  Plaintiff fails to offer evidence–beyond opinion–to

justify these intemperate accusations.  Nor does Plaintiff offer any basis for the depositions

sought, providing only the names of individuals to be deposed and an un-defined 30(b)(6)

request." Defendant's Opposition to Plaintiff's Motion to Conduct Additional Depositions, to

Extend the Time for Completing Discovery, and to Require the Navy to Pay Reasonable

Attorney's Fees and Costs ("Def.'s Opp. to Pl.'s Mot. for Addl. Disc.") at ##.

Plaintiff and defendant's characterizations of the deposition testimony are summarized in

the following chart:

| | **Plaintiff's Argument** | **Defendant's Argument** |
|---|---|---|
| Diane Carney | Carney testified that data regarding the workload of supervisory contract specialists that was provided to Holleran continues to exist on the FIS database.  Carney also testified that Holleran knew Carney would generate WIP reports and Excel spreadsheets from the FIS database because she had done so in the past for both Holleran and her supervisor, Norma Jean Schnakenberg. Plaintiff argues that this demonstrates that the existence of the discovery plaintiff originally requested was common knowledge at EFACHES. Pl.'s Mot. for Addl. Disc. at 4. | Plaintiff "mischaracterizes [Carney's] testimony to the point of being disingenuous with the Court. Ms Carney's testimony merely confirmed the existence of data in the FIS database, and the ability to extract data in pre-programmed reports and individualized inquiries." Def.'s Opp. to Pl.'s Mot. for Addl. Disc. at 4. |
| Patricia Holleran | Holleran testified that she destroyed some hard copies of the documents on which she relied and provided other documents to Schnakenberg and other EFACHES officials. Holleran also disclosed, for the first time, that she created additional documents containing workload, staffing, and budget information as part of the restructuring decisions she made.  None of these documents was previously identified or provided in response to discovery requests. Holleran testified that she often requested and received data, printed in the WIP reports, from the FIS database via Diane Carney.  Holleran also had direct access to the FIS database through her desktop computer.  Holleran further testified that former EFACHES counsel Chad Miller ("Miller") assisted in the preparation of the Holleran declaration. | Holleran testified that she made notes concerning workload, including data received from Carney and input from "senior 1102s" in the field on sticky notes. She testified that she always gave greater weight to the data from the "senior 1102s" in making staffing recommendations, which she forwarded without her notes.  The "documents" she "destroyed" were notes from which she made recommendations after she no longer had use for them.  Her testimony that her work notes could not be recreated is not contrary to Carney's testimony because the FIS data does not account for the input from senior 1102s, adjustments based on type of pending work, rounding, or budget decrements. |

| Patricia Chalfant | Chalfant is the former EFACHES staff counsel responsible for the Navy's discovery responses in this litigation.  At numerous points in her deposition, Chalfant could not remember the details of her preparation of the discovery responses, including the specific persons to whom she spoke and why the WIP reports were not found or produced before the first trial.  Plaintiff claims that Chalfant's inability to remember "leads to the inescapable conclusion" that she is "attempting to bloc [sic] plaintiff's discovery efforts." Pl.'s Mot. for Addl. Disc. at 11. | Chalfant's memory loss is not circumspect since she left the agency years ago and had no reason to focus on or retain knowledge of plaintiff's case. |
|---|---|---|
| Cindy Guill | Guill was Chalfant and Miller's supervisor and agency counsel at the first trial, who testified that she conducted no investigation of the circumstances surrounding the Navy's failure to produce relevant documents.  Plaintiff argues: "Guill's lack of interest in uncovering the Navy's wrongdoing suggests she played an active role in the discovery abuses and preparation of the false Holleran Declaration." Pl.'s Mot. for Addl. Disc. at 13. | Guill's memory loss is not circumspect since she did not work directly on the case until spring 2004. |
| Chad Miller | Miller is the agency attorney who succeeded Chalfant and was staff counsel at the time Holleran declaration was executed.  Miller denied any role in preparing the declaration but said that he probably had her sign it.  Holleran and Miller's testimony are "irreconcilable" and "the evidence shows that one or both of these witnesses gave perjured testimony regarding the origins of and preparation of the January 11, 2002 Declaration." Pl.'s Mot. for Addl. Disc. at 13. | Miller's memory loss is not circumspect because employment law was less than 5% of his workload and because he assumed the primary agency counsel role after general discovery had closed. |

After reviewing the deposition testimony and the pleadings, this court finds that

plaintiff's arguments are, at best, overstated.  Plaintiff offers baseless allegations of stonewalling

and perjury as justification for seeking additional depositions.  But, after a painstaking review of the depositions of Holleran and Carney, the court cannot say that the defendant is stonewalling or otherwise obstructing the post-trial discovery process.  In addition, plaintiff's concerns for additional discovery are best alleviated not by additional depositions of individuals who were far less involved in the staffing recommendations at issue in this case, but by receiving information from the FIS database as well as copies of the budget and planning documents into which Holleran's staffing recommendations were incorporated.  Although the exact data upon which Holleran relied may never be recreated (because Holleran relied not only on numbers pulled from FIS but also on conversations with senior 1102s), plaintiff will have the benefit of: (1) receiving all relevant information that can be recovered from FIS, (2) receiving all budget and staffing documents that incorporated Holleran's recommendations, and (3) being able to argue that the information currently available is not all of the information upon which Holleran based her decisions.

### E.    Defendant's Requests for Admissions

On June 3, 2004, defendant deposed plaintiff, and on June 25, 2004, defendant served upon plaintiff a Request for Admissions Relating to Plaintiff's Failure to Mitigate.  These requests concern when plaintiff or her counsel knew of the substance of the testimony of plaintiff's witness, Jasper Garner ("Garner"), who testified at the first trial that the WIP reports for the relevant time period existed at the time Garner retired from the Navy.

Plaintiff claims that these requests were untimely because, at the time they were served, post-trial discovery was set to close on July 1, 2004.  Plaintiff also claims that, via these requests, the Navy seeks plaintiff's and plaintiff's counsel's work product.  Accordingly, plaintiff seeks a

protective order.

Defendant argues that plaintiff is not prejudiced by the timing of the requests for admissions and that, had the testimony at the depositions of Garner and plaintiff, on June 2 and 3, 2004, been more forthcoming, the requests would have been unnecessary.  Garner did not recall providing plaintiff or her counsel the substance of his testimony before testifying at trial, and plaintiff denied having such knowledge before Garner's testimony at trial.  As defendant argues, however, it "is simply not credible . . . for [p]laintiff or her counsel to maintain that counsel had no knowledge of Mr. Garner's testimony prior to his examination at trial." Defendant's Opposition to Plaintiff's Motion for Protective Order ("Def.'s Opp. to P.O.") at 2.  Defendant further argues that the work-product privilege does not apply.

When defendant served its requests for admissions on June 25, 2004, discovery was set to close on July 1, 2004.  However, on June 30, 2004, this court extended the discovery period for both parties until July 15, 2004.  Even with the court-ordered extension, plaintiff's responses were not due until after the close of discovery because they were due, under Rule 36, on July 25, 2004.  Thus, even under the modified scheduling order, the requests for admission were untimely. See Fed. R. Civ. P. 36.  See also Banks v. Office of Senate Sergeant-at-Arms, 222 F.R.D. 7, 17 (D.D.C. 2004).

However, plaintiff has since moved for an additional discovery, including depositions and supplemental document production, and the Order that accompanies this Opinion will grant in part one of plaintiff's motions.  Therefore, the post-trial, limited discovery period will be extended for both parties until July 1, 2005.  Accordingly, plaintiff will have more than thirty days from the date of the accompanying Order to respond to defendant's requests, which are very

18

straightforward and do not constitute a burden for plaintiff.  In addition, with the new discovery

deadline in place, the requests will be considered timely.

Even if the discovery period were not extended, however, this is not a case in which

defendant served discovery requests in the eleventh hour. Cf. Toone v. Fed. Express Corp., No.

Civ. A. 96-2450, 1997 WL 446257, at *8 (D.D.C. 1997) (granting a motion for a protective order

where the requests for admissions were served on the same day that discovery was set to close,

and under the Rules, the defendant had until the day of the original trial date to respond).  In

addition, although the requests were untimely when they were served, they were not burdensome,

and they would not have been served at all had plaintiff been more forthcoming during her post-

trial deposition.  Finally, allowing defendant's requests to stand is consistent with the intent of

Judge Kessler's May 12, 2004 Order, in which she granted defendant's motion for limited

discovery regarding plaintiff's failure to mitigate.

As for plaintiff's claim of privilege, the information requested simply is not protected by

the work-product doctrine.   Federal Rule of Civil Procedure 26(b)(3) provides that materials

prepared in anticipation of litigation or for trial by an attorney or a party are protected from

disclosure, and they may be subject to discovery only upon a showing of substantial need and

undue hardship. Fed. R. Civ. P. 26(b)(3).  Even if the work-product privilege yields to a showing

of need, the court must still protect the "mental impressions, conclusions, opinions, or legal

theories of an attorney." Id. See also Tax Analysts v. Internal Revenue Serv., 117 F.3d 607, 619

(D.C. Cir. 1997).

Here, it is undisputed that, at some point in time, plaintiff and her counsel learned the

substance of Garner's testimony.  What is unknown, and what defendant seeks to discover, is

*when* plaintiff and her counsel learned that Garner would testify that WIP reports were in existence when he retired from the Navy.  The timing of this acquisition of knowledge simply is *not* something that was "prepared in anticipation of litigation or for trial" even though the preparation of the witness certainly was.  Accordingly, the information defendant seeks is not protected by the work-product privilege, and plaintiff must respond to the requests for admission within 30 days of the accompanying Order.

### F.     Request for Production of Documents ## 1, 2, 39, 55, 56, 76, and 77

The following chart summarizes plaintiff's requests for production of documents, defendant's response, and defendant's argument as to why no further production is warranted.

| Req. | Plaintiff's Request | Defendant's Response | Defendant's Argument |
|---|---|---|---|
| #1, 2 | All documents consulted and/or relied upon in responding to Plaintiff's Interrogatories or Requests for Admissions. | Defendant will supplement its response after plaintiff propounds interrogatories and requests for admissions. | Defendant's document production included all non-privileged documents on which defendant relied in preparing responses to interrogatories and requests for admissions. |
| #39 | Each and every document, including email, relating to the decision(s) to refuse to provide plaintiff with support while she was assigned to Carderock. | Defendant objected and then stated it would produce discoverable, non-privileged documents that could be found by means of a reasonably diligent search. | Defendant produced all discoverable, non-privileged documents. |
| #55 | Any and all documents detailing the decision(s) to keep plaintiff at the Carderock office after the workload had shifted to the NFO at Bethesda. | Defendant objected and stated that the workload did not shift as the document request assumed. | Defendant cannot produce documents related to a non-existent action. |

| ## 56, 76, and 77 | All documents used or referred to in connection with decisions regarding the staffing of contract personnel at any field office in EFACHES, including documents relating to WIP and including the Carderock and NFO Bethesda offices. | Defendant lodged objections and then stated that "the documents used to determine the staffing levels are work in place ("WIP") reports.  However, defendant does not retain or have a repository for historical work in place ("WIP") reports." | Defendant supplemented this response with the documents it produced at trial and in limited post-trial discovery (including post-trial depositions of Holleran and Carney). |
|---|---|---|---|

Plaintiff argues that, based on Holleran and Carney's depositions, it is apparent that documents other than the WIP reports were used to determine staffing levels.  Accordingly, plaintiff seeks an order requiring defendant to supplement its responses to the above-referenced document requests and to produce the responsive documents. Pl.'s Mot. Compel at 3-4 (citing Fed. R. Civ. P. 26(e)).  Specifically, plaintiff seeks: (1) customized reports of Excel spreadsheets describing the workload at EFACHES field offices that Carney produced at Holleran's or Schnakenberg's request, (2) information contained in the WIP reports, which is accessible via the FIS database, (3) budget and planning documents given to Bob Silver, Dave Ward, and Norma Jean Schnakenberg, and (4) standard reports produced by Carney for Holleran.  Defendant insists, however, that "[t]he fact remains that there are no additional responsive documents to produce." Def.'s Opp. to Mot. Compel at 4.  Indeed, according to defendant, Holleran and Carney's depositions reveal that there are no other documents to produce because any other documents were "transitory work papers" that Holleran "prepared and discarded contemporaneously with the staffing recommendations she made." Def.'s Opp. to Mot. Compel at 4.

Thus, in this motion, the parties again rehash arguments they have made before.  In the interest of completeness, I will address each of plaintiff's requests.

*Customized reports of Excel spreadsheets describing the workload at EFACHES field offices.*  According to defendant, Carney testified that she provided workload information to Holleran informally, not on Excel spreadsheets, as plaintiff maintains, and Holleran testified that the information often came on "stickies."  In plaintiff's reply, she seemed to abandon this request, presumably because no Excel spreadsheets exist.  In addition, after reviewing Holleran and Carney's deposition testimony, it is clear that Carney consistently provided Holleran with numbers, "stickies," or informal reports – not Excel spreadsheets.  Accordingly, the court will not direct defendant to produce any such documents.

*Information contained in the WIP reports, which is accessible via the FIS database.*  Defendant concedes that the information contained in the WIP reports is permanently maintained on the FIS database and has not been deleted, but notes that it offered access to the database which plaintiff failed to accept. Def.'s Opp. to Mot. Compel at 5. As indicated earlier in this Opinion, Carney must query the FIS database and consult relevant R26 reports to retrieve information relevant to the workload at the EFACHES field offices during the relevant period of plaintiff's employment at the Navy and provide this information to plaintiff within 60 days of the accompanying Order.

*Budget and planning documents.* According to defendant, Holleran testified that the resulting staffing levels, not the underlying workload data, were incorporated into other documents, such as those used for budgeting and planning. Def.'s Opp. to Mot. Compel at 5. While this is a legitimate reading of Holleran's deposition, in fairness and to ensure that plaintiff

receives all information to which she is entitled, the court will order the defendant to produce all

budget and planning documents that contained Holleran's staffing recommendations for the

period of January 1, 1997 through October 1, 1999.

*Standard reports produced by Carney for Holleran.* It is the court's understanding that

these are the reports based on the FIS data, and that any written format in which they appeared

has either been discarded or produced. As for "reports" that have not yet been produced, plaintiff

will receive the underlying information once defendant complies with the directives established

by this Opinion and the accompanying Order.

An Order accompanies this Memorandum Opinion.


_____
**JOHN M. FACCIOLA**
**UNITED STATES MAGISTRATE JUDGE**

Dated: