UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAVONNE JINKS-UMSTEAD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 99-2691 GK/JMF |
| v. ) | |
| ) | Next Event: Motions *in Limine* Due |
| GORDON ENGLAND, ) | November 1, 2005 |
| SECRETARY OF THE NAVY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF'S MOTION *IN LIMINE* TO BAR ORAL TESTIMONY
NOT SUPPORTED BY DOCUMENTS AND EXCLUDE EVIDENCE THAT IS
IRRELEVANT AND/OR CONFUSING AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Plaintiff respectfully requests that the Court bar the Navy from introducing oral testimony

that purports to be based on the contents of documents not produced by the Navy.[1]  Plaintiff also

requests the Court exclude evidence that is irrelevant and/or confusing.

The Navy's case at the first trial was built in large part on generalized testimony regarding

downsizing elsewhere in EFACHES.  Neither Holleran nor Schnakenberg addressed whether there

was any downsizing in the *1102* job series.  In addition, the Navy never produced a single document

relating to any down-sizing in the relevant job series, 1102 contract specialists, or that there was a

reorganization that occurred during the relevant time period.

Plaintiff sought consent to this motion, but such consent was not provided.

---

[1]       Plaintiff is filing a separate motion *in limine* to address what the jury should be
told regarding the  Navy's discovery abuses and spoliation of evidence, Plaintiff's Motion *in
Limine* for a Jury Instruction on the Navy's Discovery Abuses and Spoliation of Evidence, or, in
the Alternative, for Partial Summary Judgment.

**INTRODUCTION**

During trial, the Court ruled that Ms. Jinks-Umstead established a *prima facie* case for both her discrimination and retaliation claims. Those rulings are the law of the case.

The Navy's defense to Ms. Jinks-Umstead's *prima facie* case of discrimination and retaliation was based on the unsupported claim that the Work in Progress ("WIP") Reports justified denying Ms. Jinks-Umstead support from contract specialists in job series 1102 or depriving her of her supervisory status. The Navy also claimed there was a reorganization of EFACHES contracting operations, but produced no evidence that any person with authority actually ordered such a reorganization related to the contracting duties and responsibilities of Ms. Jinks-Umstead that *occurred* during the relevant time period. Neither of these defenses was supported by credible admissible evidence.

In fact, as military bases closed, and facilities were transferred, the downsizing elsewhere in the Navy generated more work for the contract specialists in the 1102 job series. Much of the Navy's trial evidence is irrelevant or otherwise inadmissible because this evidence fails to address the precise question of staffing or downsizing in plaintiff's 1102 job series. Similarly, testimony about downsizing or reorganizations that did not affect the 1102 job series is equally irrelevant. Generalized testimony regarding downsizing that did not affect this particular job series would simply distract or confuse the jury.

There is no real dispute that Ms. Jinks-Umstead was transferred to Carderock because the Navy had a legitimate business reason for having a supervisory contract specialist stationed at Carderock supervising at least *three* contract specialists in the 1102 job series and a legitimate business reason for having a total of four contract specialists in the 1102 job series [incuding Jinks-

Umstead] at Carderock.  In fact, prior to offering the position to plaintiff, the Navy actively recruited and interviewed for the supervisory contract specialist position at Carderock.

During her trial testimony, Ms. Jinks-Umstead testified that the amount of contracting work at Carderock was objectively measurable both in terms of contract dollars and, more importantly, the number of contracting actions.  Ms. Jinks-Umstead also testified that the contracting workload was constant throughout the time of her assignment to Carderock and that as she lost her staff, she was required to do their work.  Ms. Jinks-Umstead also testified that her workload was different and more difficult than that of other contract specialists because her customers were located around the country.  *E.g.*, Trial Transcript, June 25, 2003 a.m. at 53-54, Docket # 339.

Plaintiff also testified that Isabell Watts, an African-American woman in the 1102 job series left Carderock to take another position at NASA because Holleran refused to allow Watts to be promoted.  The Navy refused to provide Ms. Jinks-Umstead with any replacements who had the necessary training and skills in the 1102 job series.

Review of the trial transcript indicates that Navy witnesses testified regarding numerous matters that were either irrelevant or allowed the agency to benefit from its failure to comply with its Initial Disclosure and discovery obligations.

For the reasons set forth below, we respectfully request the Court bar the Navy from introducing evidence or oral testimony regarding:

1.  Evidence regarding any job series *other than* Ms. Jinks-Umstead's job series, 1102 contract specialists;

2.  Evidence that there was any downsizing in job series 1105 and 1106;

3.  Evidence there was any substantial change in the workload at Carderock during the

entire relevant time period from February 19, 1997, when Ms. Jinks-Umstead reported to Carderock until October 10, 1999.[2]

4. Evidence that the workload at Carderock was not sufficient to support four contract specialists during the entire relevant time period.

5. Evidence that there was a hiring freeze on 1102's at EFACHES or any restriction on hiring 1102's or a command decision not to replace any staff in the 1102 job series.

6. Evidence that there was any reorganization or organizational realignment involving contract specialists in the 1102 job series during the relevant time period prior to October 10, 1999.

7. Evidence that the Navy sought to place plaintiff in a position as a labor relations specialist working for Diane Truman.

8. Evidence that there was any downsizing in the 1102 job series or any consideration of a reduction in force, or that EFACHES was in any way motivated by a desire not to subject Jink-Umstead to a RIF.

9. Evidence that any decision was made to "roll up" Carderock into Bethesda during the relevant time period

10 Evidence that Sheer accepted a downgrade, because he was not an EFACHES employee.

---

[2]     Ms. Jink-Umstead filed suit on October 12, 1999. For the sake of simplifying the issues at trial, plaintiff will limit her claim as of October 10, 1999. According to documents produced by the Navy in 2005, EFACHES included contract specialists from Public Works on its rolls, effective October 10, 1999.

## BACKGROUND

### I. Factual Background

The Navy assigned Ms. Jinks-Umstead to Carderock as a result of a settlement of her claims arising out of events at Quantico.[3]   Capt. Sabbatini told Ms. Jinks-Umstead that the assignment would be a career-enhancing opportunity. Trial Transcript, June 25, 2003, a.m. at pp. 97-99, Docket #339.

In 1997, the Navy staffed the Carderock office with four employees in the relevant job series, *i.e.*, 1102 contract specialists.  In September, 1997, just before Delores Adams left Carderock, there were four contract specialists in job series 1102 who were stationed at Carderock.  These contract specialists were Delores Adams, Isabell Watts, Janice Washington and plaintiff. Ms. Jinks-Umstead supervised these contract specialists as a supervisory contract specialist. Trial Transcript, June 25, 2003, 15-30, Docket #339.

At trial, Patricia Holleran, who was in charge of calculating the staff levels based on the amount of work performed, admitted that there was enough work at Carderock to justify assigning four contract specialists to Carderock in 1997.  Trial Transcript, June 27, 2003, a.m. at 33, 34 (Docket #330).[4]  Trial Transcript, June 26, p.m. at 76, Docket # 329.

Holleran agreed that the minimum of contracting work for which the Carderock office was available during FY 1997 was $3.5 million per year. Trial Transcript, June 26, p.m. at 80, 92, 106,

---

[3]        On summary judgment, the Court ruled that events at Quantico are no longer part of this litigation.

[4]        Holleran was evasive when asked about which EFACHES field offices had reductions in 1102's. Trial Transcript, June 27, 2003, a.m. at 32-33, (Docket #330).  Documents produced by the Navy on June 6, 2005 demonstrated that EFACHES continued to hire contract specialists in the 1102 series.

107, 108, Docket #329.

In February 1998, plaintiff filed her initial complaint of discrimination. At the same time, she sought a mediated resolution to this dispute. Those EFACHES officials and attorneys who participated in mediation, *i.e.*, Holleran and Chalfant, were fully aware of the workload issues raised by plaintiff. *See* Defendant's Summary Judgment Exhibit 22, which is attached hereto as Exhibit A. As Ms. Jinks-Umstead testified at trial, the workload did not change during the time she was assigned to Carderock. In its responses to plaintiff's request for production of documents, the Navy also represented that the workload at Carderock did not, in fact, change.[5]

On April 13, 1999, plaintiff's supervisors Holleran and Schnakenberg prepared an "Answer" to plaintiff's administrative EEO Complaint representing to the Navy's EEO office that the staffing levels for EFACHES field offices "are based on the number of contracting actions and the dollar value of the 'work in place' for contracts." Exhibit A. This representation was prepared with the assistance of agency counsel Chalfant, Holleran June 24, 2004 Deposition at p. 83, and was signed by **both of** plaintiff's supervisors, Patricia Holleran, and by her second level supervisor, Norma Jean Schnakenberg. Exhibit A.

The administrative "Answer" is a written acknowledgment that documents relating to Ms. Jinks-Umstead's work load at Carderock were relevant and, indeed, the workload documents were the key to the Navy's claimed defense that there was a legitimate business justification for the actions taken against Ms. Jinks-Umstead, *i.e.*, there was a reduction in the number of contracting

---

[5]     Plaintiff sought in Request # 55: "Any and all documents detailing the decision(s) to keep Plaintiff Jinks-Umstead at the Carderock Office after the workload had shifted to the NFO at Bethesda." The Navy responded by stating: "Defendant objects to this document request as vague and ambiguous because it is lacking in foundation. ***Plaintiff's workload did not shift as the document request assumes.***" (Emphasis added). Docket # 280.

actions and/or dollar value of the work in place for contracts. Exhibit A.

On October 7, 8, 1999, Holleran met with the EEO Investigator who was investigating plaintiff's complaints of discrimination and retaliation. Trial Transcript, June 27, 2003, at 8 *et seq.*, Docket # 330. Holleran told the EEO investigator that she had staffing sheets that indicated the dollar value for contracting working done at the EFACHES field offices. The staffing sheets projected projects for the coming year for each EFACHES field office. There was one page for each fiscal year. These documents would allow comparison to the total amount of work performed by each contract specialists in job series 1102 for each year fiscal year 1996 to 1999.[6] Trial transcript, June 27, 2003 at 8-12.

Holleran promised the EEO Investigator she would provide copies of these documents. She did not do so and these documents were never produced in discovery. Trial transcript, June 27, 2003 at 8-19, Docket #330.

Holleran's boss, Norma Jean Schnakenberg testified at trial that the staffing decisions were 99 percent quantitative. Trial transcript, June 27, 2003 at 119. Thus, documents relating to the Carderock workload are absolutely essential to demonstrating pretext and to disproving the Navy's claimed *oral* defense that there was a legitimate business reason for the adverse actions taken against Ms. Jinks-Umstead.

On June 6, 2005, the Navy produced approximately 983 pages of the requested documents in hard copy or on CDROM. The *June 6, 2005* production of documents underscores that the Navy's

_____

[6]     Holleran testified that she called these figures work in place, but insisted these were not really work in place. Trial transcript, June 27, 2003 at p. 12.

discovery abuses extend far beyond the refusal to produce any WIP Reports prior to the first trial.[7]

### B. Representations During Initial Disclosure and Discovery

This is an employment discrimination lawsuit brought by LaVonne Jinks-Umstead against the Navy that will have to be tried for a second time because agency officials failed or refused to produce documents relevant to the workload and staffing at EFACHES, including Carderock field office, where plaintiff was assigned.[8]

The Navy did not provide in its Initial Disclosures any WIP Reports or related documents explaining the staffing decisions. Nor did the Navy ever include in its Initial Disclosures documents describing any reorganization involving Ms. Jinks-Umstead's job series was implemented ***prior to the time she filed suit.*** In particular, the Navy did ***not*** provide in its Initial Disclosures the documents Holleran promised to the EEO investigator.

Plaintiff requested documents relevant to these issues in discovery on ***June 12, 2000, more than three years prior to trial.*** In her Second Request for Production of Documents, Request # 76,

---

[7]       For example, EFACHES maintains a document entitled "EFA Chesapeake Manpower Listing," but the Navy produced one copy of this document that is dated November 13, 1997. Had the Navy provided all such documents, plaintiff would have been able to compare the number of supervisory contract specialists in the 1102 job series assigned to Carderock with the 1102 personnel assigned to other EFACHES's offices throughout the entire time period at issue.

The Navy produced documents entitled "EFA Chesapeake CIVPERS Projections" for the period January, 1999 through October, 1999. This documents identifies the persons in the 1102 series who left or were hired by EFACHES. If plaintiff had these documents for 1997 and 1998, Ms. Jinks-Umstead could have demonstrated to the jury that, notwithstanding generalized testimony about down-sizing, EFACHES actually hired 1102 contract specialists during the relevant time period and could have assigned the new hires in the 1102 job series to Carderock.

[8]       During the relevant time period, the WIP Reports were stored a short distance from Holleran's office. Memorandum Opinion, February 6, 2004 at p. 4, n. 1.

plaintiff requested: "Each and every document relating to WIP (Work in Progress), which were used or referred to in connection with decisions regarding staffing contract personnel at any field office in EFA Ches." On August 4, 2000, the Navy responded by stating: "See objections and response to document request 77." Docket # 280.

In her Second Request for Production of Documents, Request # 77, plaintiff requested: "Any other document used or referred to in connection with decisions regarding the staffing of contract personnel at any field office in EFA Ches." On August 4, 2000, the Navy responded by stating:

> Defendant objects to this document request as irrelevant, overly broad, unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence insofar as it seeks all documents relating to staffing of field offices where or when plaintiff did not work at those offices. Subject to and without waiver of this objection and the foregoing general objections, which are incorporated by reference herein, ***the documents used to determine staffing levels are work in place ("WIP") reports.*** However, defendant does not retain or have a repository for historical work in place ("WIP") reports. (Emphasis added)

Docket # 280. Plaintiff requested these relevant documents more than three years before the first trial.

Plaintiff's discovery requests included Interrogatory # 4. This Interrogatory requested the Navy to:

> Identify each and every document requested in Plaintiff's First Request for Production of Documents, or any subsequent Request for Production of Documents, which has been destroyed, or has not been produced pursuant to the Rules of this court. Include in your answer the identity of the person who destroyed such document and why this document was destroyed or not produced.

On August 4, 2001, the Navy responded as follows:

Defendant incorporates by reference his objections to each of plaintiff's document requests and statements of what categories of documents he will produce in response to those requests and the conditions under which he will produce documents in those categories. Subject to and without waiver of these objections and the foregoing general objections, which are incorporated by reference herein, *defendant is not aware of non-privileged, discoverable, documents within those categories which have been destroyed or which defendant has not produced or will not produce or make available for inspection and copying at the first mutually convenient opportunity* when then conditions are met, other than such documents identified in the responses to the documents requests.

Docket # 277.

The Navy's discovery responses contained at least *four* separate representations that are important for the purposes of this motion. First, the Navy represented that:

1.   All of the documents "used or referred to in connection with decisions regarding the staffing of contract personnel at any field office in EFA Ches" fall within the scope of WIP Reports;

2.   None of the historical WIP Reports were retained;

3.   The Navy had not destroyed any documents requested by plaintiff, either as part of an alleged document destruction policy or otherwise; and

4.   The Navy had not failed to produce any documents for any other reason.

The Navy's representation that "WIP Reports" were the only documents responsive to plaintiff's discovery requests was false. Holleran was fully aware that electronic "WIP Reports" continued to be available in the computer mainframe ("FIS"). Holleran even had an "icon" for FIS on her desktop computer. Holleran Deposition, June 28, 2004, at 27-28 Docket #287. Holleran prepared [and had knowledge of] numerous budget and planning documents *other than the WIP*

*Reports* that were responsive to plaintiff's document requests. *Id.* at 100, 110, 200.

### III. Continuing Misrepresentations

After providing those false and/or misleading Initial Disclosures and discovery responses, defendants continued to insist workload documents, including WIP Reports, did not exist. On January 11, 2002, Holleran signed a Declaration under penalty of perjury that the following statement was "true and correct." "One of the matters I addressed in the Letter[9] was the use in determining EFACHES field contracting office staffing of the number of contracting actions and the dollar value of the "work in place," or WIP," for contracts. This information is compiled in WIP Reports which are used to determine staffing levels. EFACHES does not retain or have a repository for historical work in place ("WIP") Reports. *Id.*[10] Exhibit B.

The Navy even filed a Motion *in Limine* to prevent Ms. Jinks-Umstead from arguing spoliation to the jury and to prevent the jury from learning that the Navy refused to produce in discovery the documents on which the Navy's entire defense rested. Docket #117.

In opposing Plaintiff's Motion *in Limine* Regarding Spoliation and in Support of Defendant's Motion *in Limine*, the Navy argued it would be unfair to require the Navy to bear the consequences of its destruction of relevant documents. The Navy filed its Consolidated Reply in Support of Defendant's Motion *in Limine* to Exclude Proposed Evidence of Alleged Document Destruction and

---

[9]     The Letter to Rudy Sarmiento to which Holleran refers is Defendant's Summary Judgment Exhibit 22, which was prepared as EFACHES's "Answer" to plaintiff's administrative charges of discrimination and retaliation, which is Exhibit A.

[10]     The January 11, 2002 Declaration was prepared in response to Plaintiff's Motion to Strike Navy Exhibit # 22, Docket # 70, on the grounds it was not admissible under the business records exception to the rule on hearsay. The Declaration was first filed with Defendant's Opposition to Plaintiff's Motion to Strike on January 14, 2002. Docket # 78. Judge Kessler granted Plaintiff's Motion to Strike. Docket # 90.

Spoliation and Opposition to Plaintiff's Motion *in Limine* to Bar Defendant From Presenting Oral

Testimony Concerning Documents Defendants Allegedly Spoliated and Did Not Produce. Docket

#139; Docket #140 (July 26, 2002) (representing to the Court that the January 11, 2002 Holleran

Declaration was correct and that the "old" WIP Reports really are discarded "when a new one is

prepared.").

## IV. Post-Trial Discovery

Plaintiff conducted five post-trial depositions to determine why she was not provided relevant

documents. Ms. Jinks-Umstead sought to determine the factual basis for the actions taken against

her by the Navy and to determine the circumstances under which the false January 11, 2002,

Holleran Declaration was prepared and filed with the Court in an effort to deny plaintiff a trial of her

claims.

## A. Fact Witnesses

Plaintiff deposed Diane Carney on July 13, 2004. Carney was the EFACHES computer

program analyst whose expertise with the FIS data base enabled her to generate every imaginable

programmed report, query, or EXCEL spreadsheet from the computerized FIS data base. Carney

Deposition at pp. 155-160, 189-191, Docket #338.

Carney testified that it was common knowledge in EFACHES that she was the "go to" person

for FIS to generate WIP Reports or other arrays of data. Carney testified that Holleran knew that

Carney had the ability to generate WIP Reports and EXCEL spreadsheets from the FIS data base.

In fact, Carney had generated many such reports for Holleran *from FIS* in the past and had also

provided data to Schnakenberg, Holleran's supervisor. Carney Deposition at 61-63, 112-114, 160,

167-168, 173, 189-205. Carney's testimony demonstrates that Holleran knew the existence of much,

if not all, of the discovery requested by plaintiff was common knowledge at EFACHES.

On June 28, 2004, plaintiff deposed Patricia Holleran, the agency official who, according to her supervisor, was charged with the responsibility for making the staffing decisions affecting Ms. Jinks-Umstead. Holleran Deposition, at pp. 22, 29,  Docket #287.

Holleran testified that she destroyed the hard copies of some of the documents she relied upon to make staff decisions.  Holleran also testified that she provided some documents to Schnakenberg and other EFACHES officials. *E.g*, Holleran Deposition, at pp. 80, 100, 110.

Holleran disclosed for the first time during her June 28, 2004 deposition that she created additional documents containing workload, staffing and budget information as part of the decision-making process during the relevant time period.  Holleran Deposition at pp. 143, 153.

None of these workload, staffing and budget documents had been previously identified in the Initial Disclosures or in the Navy's discovery responses.  None of these workload, staffing and budget documents were produced in response to plaintiff's discovery requests prior to trial.  Indeed, the existence of these documents is contrary to the Navy's explicit representation in response to Plaintiff's Document Request #77 that the documents requested by plaintiff were WIP Reports.

Holleran admitted under oath that she knew the data printed on paper WIP Reports were contained in the FIS data base.  Holleran admitted she often requested such data from Diane Carney during the relevant time period and that Carney provided such information to her, often in the form of EXCEL spreadsheets. Moreover, in addition to obtaining information from FIS data base through Carney, Holleran even had direct access to FIS through her desk top computer.[11]    Holleran

---

[11]    The Navy continues to mislead the Court by stating that: "At the time of Defendant's August, 2000 response, neither counsel nor Holleran was 'aware' of **_the_** 'WIP' Reports produced at trial."  Supplemental Answer to Plaintiff's Interrogatory # 4 at p. 2, n 1,

Deposition at 27-35, 43-45, 65.

Of particular import is Holleran's testimony regarding the January 11, 2002, Declaration. Holleran testified at trial that she could not remember the name of the attorney who drafted the January, 2002, Declaration. However, at her deposition, Holleran suddenly remembered that former EFACHES counsel Chad Miller assisted in the preparation of that Declaration.[12]   Holleran Deposition at pp. 245, 249, 312.

### B. Agency Counsel

On May 3, 2004, plaintiff deposed Patricia Chalfant, who was formerly the first lead counsel in the defense of this case.   Chalfant worked closely with Holleran in preparing Defendant's Summary Judgment Exhibit 22 prior to its submission to the Navy's EEO Office.   Chalfant May 3, 2004 Deposition at pp. 74-80, Docket # 274.

Chalfant testified on numerous occasions that she did not know or could not remember the answer to plaintiff's questions. *See e.g.*, Chalfant Deposition at pp. 36, 43.   Chalfant's recollection may have been impaired by the fact that she did not review the extensive files she left at EFACHES. Chalfant Deposition at p. 56.   Chalfant's notes were never produced and were never identified on the Navy's privilege log, or in any of the Answers to Plaintiff's Interrogatory # 4.

As lead agency counsel Chalfant was charged with preparation of the Navy's discovery responses in this litigation and she worked with Patricia Holleran and Cecilia Mohammed, another EFACHES employee, to prepare the Navy's responses to plaintiff's discovery requests.   Chalfant

---

Docket # .  Holleran clearly knew that the data of the WIP Reports were available on FIS.

[12]      This testimony came in response to a question from Judge Facciola after the parties had telephoned him for a resolution of an issue of attorney-client privilege.

Deposition at pp. 15-16. Chalfant testified she could not remember any of the people she talked to, even though she remembered they held many meetings on responding to plaintiff's discovery requests. Chalfant Deposition at pp.17, 18. Chalfant admitted that she understood WIP reports were central to the litigation. Chalfant Deposition at p. 52. Chalfant claimed she did not know why the WIP Reports were not found or produced in discovery prior to trial. Chalfant Deposition at p.10.

Chalfant claimed to have no recollection of the specifics around the composition and the preparation of Defendant's Answers to Plaintiff's First Interrogatories. Chalfant Deposition at p. 21

The following testimony on the key question of the representation that the WIP Reports did not exist is instructive, particularly in light of the fact she was the lead agency counsel working on the case:

10    Q   Did you write the statement that the

11    defendant does not retain the WIP reports?

12    A   I do not remember.

13    Q   What efforts did you make, if any, to

14    find out whether that statement was true?

15    A   I don't remember.

16    Q   Did you work on that particular

17    response?

18    A   I don't remember specifically. I'm

19    certain that I did work on this response, but I

20    don't have any specific memory different from my

21    memory of the other responses.

22      Q   We know today that that statement in

1   there is not true, don't we?

2          MR. FIORE: Objection.  This witness

3   may not know, and it's not necessarily a statement

4   of fact.  That's your argumentative position.

5          BY MR. KARL:

6      Q   You can answer.

7      A   I don't know.

Chalfant Transcript at pp. 49-50.

On June 24, 2004, plaintiff deposed Chad Miller, the agency attorney who succeeded Chalfant.  Miller was agency counsel assigned to this case at the time Holleran executed the January 11, 2002, Declaration.  Miller faxed the executed Declaration to AUSA David Ball.  Miller denied under oath that he played any role in the preparation of the false Declaration, but "probably had her sign it."  Miller testified he does not remember reviewing the Declaration for accuracy or reviewing it with Holleran.   Miller Deposition at pp. 222-225 249-252, 264-266, Docket #337.

Plaintiff also deposed Cindy Guill, the attorney who supervised Chalfant and Miller during the relevant time period.  Guill took over representing EFACHES when Miller left EFACHES in approximately April, 2002.  Guill attended the first trial as agency counsel.

Guill testified that she had conducted no investigation of the circumstances surrounding the Navy's failure to produce relevant documents.  Guill Deposition at pp. 19-20, Docket #273.  Guill stated that she took no responsibility for the discovery failure and she had no interest in finding out the reasons why the Navy failed to comply with the discovery provisions of the Rules or why the

Navy's conduct necessitated a second trial. Guill Deposition at pp. 32, 41.

In fact, Guill took no action to discipline or criticize any person for the discovery "failure" that occurred on her watch. Guill Deposition at p.104. Guill claimed she did not remember any conversations with Holleran about discovery issues and Guill never asked Holleran why she did not produce the WIP Reports. Guill Deposition at pp. 23-24. Nor did Guill have any recollection about any conversation with Chad Miller about the discovery "failure." Guill Deposition at pp. 40-41. In Guill's view, no one is responsible.[13]

Guill claimed she did not remember reviewing any of the relevant discovery responses and pleadings. Guill Deposition at pp. 14-15.  Guill had no knowledge of the identity of the persons responsible for the preparation of those documents.[14] Guill Deposition at pp. 14-15. Guill claims she does not know why WIP Reports were not produced. Guill Deposition at p. 50.

Guill claims she had no knowledge regarding the preparation of the January 11, 2002, Holleran Declaration, even though this was critical to the Navy's case and to its attempt to seek summary judgment. Guill Deposition at pp. 97-98.

We submit that the conflict between Holleran's testimony on the preparation of the January

---

[13]    The Navy claims that  Patricia Chalfant's April 19, 2004 e-mail to Cindy Guill, # 00654, was privileged. Judge Facciola ruled that this e-mail exchange includes "one sentence that is protected by the attorney-client privilege." August 24, 2005 Memorandum Op. at 7.  The fact of a claim of attorney-client privilege with respect to this e-mail exchange suggests greater involvement by Guill in responding to plaintiff's document requests.  As set forth in detail in Plaintiff's Motion to Reject Claims of Attorney-Client and Work Product Privileges and Memorandum of Points and Authorities at 13-14, there can be no attorney-client privilege between agency counsel and an ex-employee.

[14]    Chalfant, on the other hand, testified that her supervisor Cindy Guill reviewed the Navy's discovery responses. Chalfant Deposition at p. 56.

11, 2002 Declaration and that of Miller are irreconcilable. The evidence shows that one or both of these witnesses gave inaccurate testimony regarding the origins of and preparation of the January 11, 2002 Declaration.

On June 6, 2005, the Navy produced approximately 983 pages of documents. These documents were not numbered and were not organized in any particular fashion. The Navy's June 6, 2005, production was not even accompanied by a cover letter. The Navy still has not produced the documents Holleran described to [and promised to provide to] the EEO Investigator. Nor has the Navy produced all of the documents responsive to plaintiff's discovery requests.[15] The Navy has refused to identify that documents requested by plaintiff were destroyed, or otherwise not produced in answering Interrogatory # 4.

## ARGUMENT

### I. Relevant Legal Principles

#### A. Fed.R.Civ.P.26 and 37

When this case was filed on October 12, 1999, Rule 26(a)(1)(B) required the Navy to disclosure

"a copy of, or a description by category and location of, all documents, data compilations, and tangible things that are in the possession, custody, or control of the party *that the disclosing party may use to support its claims or defenses, unless solely for impeachment*."[16] (Emphasis added).

---

[15]     It appears from the June, 2005 production of documents that there are numerous categories of documents that the Navy has still failed or refused to produce.

[16]     The 2000 amendments replaced the language in bold with the following: "and that the disclosing party may use to support its claims or defenses, unless solely for impeachment." Since the duty to disclose arose under the prior version of the Rules, there is no reason to apply the amended rule.

Under the 1993 amendments to Rule 26, the Navy was obliged to disclosure all "potentially relevant items then known to the party, whether or not supportive of its contentions in the case." Advisory Committee Notes Rule 26(a)(1).

Rule 37(c)(1) provided that "a party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at trial ... any witness or information not so disclosed."

Rule 37 is self-executing. No motion to compel is necessary. If the document should have been produce under rule 26 and was not, it must be excluded unless the Navy shows that the failure to produce was justified or harmless. *Continental Lab. Prods, Inc. v. Medax International, Inc.,* 195 F.R.D. 675, 677 (S.D. Cal 2000).

Allowing Holleran, Schnakenberg or other Navy officials to testify regarding the contents of documents the Navy was required to disclose, but did not disclose, would undermine the purposes of Rule 26 and Rule 37. If the Navy can not "use as evidence at trial ... any witness or information not so disclosed," allowing Navy witnesses to testify about the alleged contents of undisclosed documents at the second trial would also be unfair to plaintiff. In the absence of documents regarding a myriad of issues, including staffing and workload at Carderock, plaintiff is hampered in effectively challenging Holleran's and Schnakenberg's oral testimony. The Navy has offered no justification for its failure to produce relevant documents and has not bothered to attempt to make any showing that its failure to comply with the Initial Disclosure requirements is "harmless."

## B. Plaintiff's Discovery Requests

Plaintiff submitted 109 Requests for Production of Documents.[17]   Plaintiff served

Interrogatory #4 that requested identification of all documents destroyed or not otherwise produced

by the Navy.[18]   In view of plaintiff's discovery requests, the Navy produced surprisingly few

documents.

At the first trial, defendants had few documents to support their claims of reorganization and

down-sizing.  These documents related to an earlier time period and job series other than the 1102

contract specialists at issue in this litigation.  The Court subsequently ruled that a number these

documents should not have been admitted into evidence at all.  Memorandum Opinion, February 6,

2004 at p. 4-5.

Since ours is a government that runs on paper, there is a strong inference that the Navy

simply refused to produce the documents requested by plaintiff.  The Navy's refusal to properly

supplement its Answer to Plaintiff's Interrogatory # 4 supports an inference of widespread violation

of the Navy's discovery obligations.  Generalized references to document retention policy and the

inclusion of **five footnotes** in a sworn Answer to Interrogatory #4 is *prima facie* evidence of

noncompliance with the discovery rules.

---

[17]     The Navy's responses to Plaintiff's First Requests for Documents were filed with
the Court on July 2, 2004, Docket #279.  Defendant's Responses to Plaintiff's Second Request
for Production of Documents are Docket #280.

[18]     Defendant's initial Answers to Interrogatories were filed with the Court on July 2,
2004, Docket #277.  Defendant's Supplemental Answer to Interrogatory # 4 was filed with the
Court on July 8, 2004, Docket #281.

## C. Best Evidence Rule

Allowing oral testimony about the contents of documents not produced by the Navy violates the Best Evidence Rule. Fed.R.Evid 1002. This is contrary to the Best Evidence Rule, Fed.R.Evid 1002 which provides: "To prove the contents of a writing. . . , the original writing . . . . is required." The Navy is seeking to use oral testimony to substitute for statements and documents which the Navy claims exist, which defendant failed to produce in its Initial Disclosures or in discovery. Defendant has failed to provide the court with documents demonstrating that a reorganization actually occurred in 1999 and allowing the Navy to circumvent its failure and refusal to produce these documents is contrary to the Best Evidence Rule. *Conway v. Consolidated Rail Corp.*, 720 F.2d 221, 224 (1st Cir. 1983), *cert. denied*, 466 U.S. 937 (oral testimony regarding railroads rules and regulations was properly excluded); *Ridgway v. Ford Dealer Computer Servs., Inc.* 114 F.3d 94, 97-98 (6th Cir. 1997)( district court could have excluded plaintiff's oral proof regarding the employment contract on best evidence grounds); *Gassaway v. Gassaway,* 489 A.2d 1073, 1074-1076, n. 4 (D.C. 1985) (testimony regarding unproduced deed is not admissible).

The U. S. Court of Appeals for the Ninth Circuit ruled that a customs officer's oral testimony about display data was barred by the "best evidence rule." *United States v. Bennett*, 363 F.3d 947, 953-954 (9th Cir. 2004). Allowing oral testimony regarding the contents of these documents would violate the best evidence rule as interpreted by the Ninth Circuit in *Bennett*.

We respectfully request the Court to revisit its ruling on the Best Evidence Rule in view of the more fully developed factual record.[19] The record from the first trial and the post-trial discovery

---

[19] Plaintiff made a similar argument before the first trial on a less developed factual record prior to the issuance of the decision from the Ninth Circuit discussed below that was rejected by this Court. Order, February 24, 2003 at 2-3, n. 3.

conducted by plaintiff demonstrates that existence of documents that were never produced by the Navy. Although the Navy denied that documents responsive to plaintiff's document requests did not exist, the production of additional documents during trial, after plaintiff rested her case, the production of hundreds of pages documents in June, 2005, and the Navy's refusal to identify documents not produced in its Answer to Plaintiff's Interrogatory # 4 demonstrate the existence of documents on which Holleran and Schnakenberg testified at the first trial.

## D. Relevance

Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As we show below, much of the evidence Holleran and Schnakenberg gave at the first trial does not satisfy this definition of relevance.

## E. Rule 403

Rule 403 of the Federal Rules of Evidence provides that

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Even if the categories of evidence discussed below are marginally relevant, such evidence should be excluded because any probative value is substantially outweighed by the danger of "confusion of the issues or misleading the jury." Allowing the Navy to introduce evidence in the categories described below would also cause "undue delay" and a "waste of time."

## F. Hearsay

Rule 801 (c) defines "hearsay" as "a statement, other than one made by the declarant while

testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 802 provides that hearsay is not admissible and the statements at issue here do not fall within any of the exceptions set forth in Rule 803 or Rule 804.

## II. Application of Legal Principles

We apply below the legal principles discussed above to the categories of evidence we believe should be excluded.

### A. Evidence Regarding Other Job Series

While it was undisputed that the Navy was downsizing in certain locations and in certain job series, the downsizing elsewhere in the Navy led to increased work for contracts specialists in the 1102 job series. It is also undisputed that the Navy was in the process of phasing out clerical and technical employees in the 1105 and 1106 job series as their functions were becoming automated. Evidence regarding other job series should be excluded at trial because it is irrelevant and has nothing to do with the contracting workload for contract specialists or the workload at Carderock.

This evidence should also be exclude under Fed.R.Evid. 403 because the probative value of testimony regarding other job series is substantially outweighed by the danger of "confusion of the issues or misleading the jury," because there is a danger that the jury would confuse the work performed by personnel in the 1105 and 1106 job series with that performed by contract specialists in the 1102 job series Allowing the Navy to introduce evidence regarding other job series would also cause "undue delay" and a "waste of time."

### B. Testimony Claiming Substantial Changes in the Carderock Workload
### and Staffing Needs

As Jinks-Umstead testified at trial, the workload did not change during the time she was

assigned to Carderock. Holleran, on the other hand, sought to justify her actions by claiming at trial there were substantial changes in the workload at Carderock. Trial transcript, June 26, 2003 p.m. Docket #329. However, the Navy never provided the documents upon which Holleran relied in making her staffing decisions.

The Court should bar the Navy from introducing any testimony claiming there were substantial changes in the Carderock workload for several reasons. The first is that in its responses to plaintiff's request for production of documents, the Navy also represented that the workload at Carderock did not in fact change.[20]

Plaintiff conducted her subsequent discovery in reliance on the representation that the workload did not shift to Bethesda. The Navy should not be allowed to change its position on this important issue more than *five* years after responding to plaintiff's requests for documents and more than *two* years after the first trial.

The second reason for barring such testimony is that allowing Holleran to give self-serving oral testimony where the Navy refused to produce the underlying documents would reward Holleran's actions in destroying the documents she used in responding to the plaintiff's administrative complaint and documents she promised to provide to the EEO investigator in October, 1999, just before plaintiff filed suit. Allowing such testimony would reward the Navy's failure to comply with its mandatory obligations to comply with the Initial Disclosure requirements and the discovery provisions.

---

[20]     Plaintiff sought in Request # 55: "Any and all documents detailing the decision(s) to keep Ms. Jinks-Umstead at the Carderock Office after the workload had shifted to the NFO at Bethesda." The Navy responded by stating: "Defendant objects to this document request as vague and ambiguous because it is lacking in foundation. *Plaintiff's workload did not shift as the document request assumes.*" (Emphasis added).

The court should not allow testimony that there was a change in the workload or staffing needs at Carderock.[21]

### C. Testimony Regarding Numbers of 1102's in EFACHES

At various times during trial, the Navy counsel argued or Navy witnesses testified that there was a hiring freeze or restrictions on hiring 1102's and/or that there was a command decision not to replace any 1102's. Navy witnesses also suggested there was downsizing in the 1102 job series. Holleran claimed there was a command decision not to replace staff, but that decision was never issued in writing. Trial Transcript, June 26, 2003 p.m. 130-131, Docket # 329.

First, the Navy never produced any documents to support the claim that there was a reduction in the need for or in the number of 1102's. Holleran testified at trial the EFACHES continued to hire 1102 contract specialists. Documents produced in *June, 2005* confirm that EFACHES hired 1102's during the relevant time period.

But the Navy refused to produce staffing documents showing hiring of the 1102's during 1997 and 1998. As a result of defendant's spoliation of documents, plaintiff is unable to demonstrate the extent of hiring of 1102 contract specialists. Allowing the Navy to claim a hiring freeze and restrictions on the hiring of 1102's in light of the incomplete document production would reward the agency for its failure to comply with the Initial Disclosure requirements and the destruction of relevant documents. Allowing self-serving testimony by Holleran and Schnakenberg on these points would reward them for failing to comply with their disclosure and discovery obligations.

Second, allowing the Navy to present testimony on these issues would violate the "Best

---

[21]     Since there was no change in the workload and since the staffing decisions were 99 percent quantitative, Schnakenberg testimony, trial transcript, June 27, 2003 at 119, it follows there was no objective change in the staffing needs at Carderock

Evidence Rule, as discussed above.

Third, allowing the Navy to present testimony through Holleran and Schnakenberg that there was an oral command decision not to replace staff in the 1002 job series would violate the rule against hearsay.[22]

### D.   Testimony Regarding Mock RIF

Holleran testified at trial that there was a connection between the Navy's failure to provide 1102 support to plaintiff and the possibility that the Navy might conduct a RIF. The implication of the testimony was that the Navy was looking out for Jinks-Umstead and was trying to save her from being subject to a RIF. Trial Testimony, June 27, 2003 at 24, 25, 50.

Initially, we note that Ms. Jinks-Umstead is a 5-point Vietnam era veteran who would receive additional credit for her Veteran's status if there were to be a RIF of 1102's. Plaintiff would be the last to go.

Second, plaintiff specifically requested documents addressing this issue in her Request # 46. None were produced and the Navy represented that "defendant is not aware of any mock reductions in force in EFACHES."[23] Since the documents requested were never produced, the Navy should not be allowed to introduce oral testimony on this issue.

Third, the testimony was misleading and confusing because it appears that Holleran sought to persuade the jury that she was acting in the best interests of plaintiff. Even if this testimony were

---

[22]       The Navy could introduce testimony from the person giving the order not to hire in the 1102 job series, but the Navy produced no such testimony at the first trial. We submit that the Navy did not produce at such testimony at the first trial because no such order was ever issued.

[23]       Defendant's Responses to Plaintiff's Second Request for Production of Documents, Docket #280.

otherwise admissible, it should be excluded under Rule 403 because Holleran plainly did not act in the best interests of plaintiff.

### E.  Organizational Realignment

The Navy also presented evidence about the merging of the Navy's Public Works Center into EFACHES, as if this merger explained the actions taken against plaintiff.  While there was such a merger involving Public Works and EFACHES, the merger did not take place until fiscal year 2000 and was not effective until October 10, 1999, after the relevant time period.  Accordingly, evidence regarding the merger should be excluded on grounds of relevance.  Alternatively, evidence regarding the merger should be excluded under Rule 403 because discussion of a future merger would confuse the jury.[24]

### F.  Possible Position in Labor Relations

In an effort to persuade the jury that EFACHES was looking out for the welfare and interests of plaintiff, Holleran testified about consideration of assigning plaintiff to work with Diane Truman in Labor Relations, a position outside of plaintiff's job series of 1102 contracts specialist.

The Court should exclude this testimony on grounds of relevance because the discussions regarding the position with Diane Truman occurred in the fall of 1999, after plaintiff had filed suit and outside of the relevant time period.  Whether there was a position in labor relations to which the Navy might have assigned plaintiff is also irrelevant to the issues for trial, which are the removal of 1102 contracts specialists from Carderock and plaintiff's loss of her supervisory position. Alternatively, the Court should also exclude the testimony under Rule 403 because such testimony

---

[24]      There was a separate reorganization into north and south divisions.  Since Holleran testified at her deposition that this did not affect those in the 1102 job serious, testimony on this issue should also be excluded on grounds of relevant and under Rule 403.

would confuse the jury.

### G. Testimony Regarding a "Roll Up" of Carderock

Holleran testified at the first trial that there was a decision made to "roll up" [or consolidate] the Carderock office into Bethesda. Trial Transcript, June 27, 2003 at 90, 109. Since the Navy never produced any admissible documents that anyone at the Navy had issued such an order, allowing the Navy to introduce such testimony at trial would reward the Navy for its failure to make Initial Disclosure and for its discovery abuses.

Allowing such testimony at trial violates the Best Evidence Rule.

Allowing such testimony from Holleran or Schnakenberg on this issue would be hearsay because neither person had the authority to authorize the consolidation of the Carderock office into Bethesda.

Allowing testimony regarding an alleged decision to "roll up" the Carderock office into Bethesda without providing any time frame should also be excluded under Rule 403.

### H. Testimony About Sheer

The Navy even introduced testimony that a Navy contracts specialist named Sheer accepted a downgrade as part of the Navy's effort to paint a portrait of an agency where the 1102 contract specialists were subject to the same pressure to reorganize as the rest of the Navy. June 27, 2003 Trial Transcript at 91. However, Sheer was not part of EFACHES and was a member of the Public Works Department. Thus testimony regarding Sheer is irrelevant and, even if marginally relevant, should be excluded under Rule 403 because such testimony would confuse the jury.[25]

---

[25]    If Sheer accepted the downgrade after October 10, 1999, this testimony should also be excluded because it is after the relevant time period.

## CONCLUSION

WHEREFORE, plaintiff respectfully requests the defendant be barred from introducing the evidence described above because allowing such evidence would reward the Navy for its failure to make Initial Disclosures and for its discovery abuses. Further, the evidence described above is irrelevant, inconsistent with and/or unsupported by missing documents that the Navy was required to preserve and produce that were never produced. A draft Order is attached.

Respectfully submitted,

_____

John F. Karl, Jr. 292458
KARL & TARONE
900 17th Street, N.W. Suite 1250
Washington, D.C. 20006
(202) 293-3200
Counsel for Plaintiff